Your Honors, I'd like to reserve four minutes. May it please the Court, I'm Bob Cattapano-Freedman, and I represent the appellants in this case. The appellants worked for years and years to earn and become fully vested in the minimum pension benefits they were promised by Airborne Express, only to have DHL take away a large portion of those benefits while representing to appellants that their benefits were being fully preserved. Yes, ma'am. I'm just having a hard time understanding. Everybody seems to agree that this is true. But I don't really understand the mechanism because, and in the other circuit case they confirmed that it's true, but I still don't understand it. My understanding is that the Defined Contribution Plan guarantees a certain amount of money by age and service and so on, and income. And there's a little chart. And there's then an offset for whatever the Defined Contribution Plan is going to produce on an annual basis. But it's all supposed to add up to the amount in the Defined Contribution Plan, right? In the Defined Benefit Plan, Your Honor. Sorry, what? The Defined Benefit Plan. Oh, the Defined Benefit Plan. Right. And that theoretically should be true whether the funds are transferred or aren't transferred. So tell me how the, I understand everybody agrees that the transfer somehow results in a decrease in the amount of money they actually physically take home every month. Why? Yeah, that's because they made certain actuary assumptions. I know you said that. I still don't know what that means. Okay. The minimum pension benefit under the pension plan is what they were supposed to get. Okay, that's what was promised to them. They didn't get that. They got half of that or even less than half of that in the end of the day because of changes that DHL made. But DHL conditioned, and it's pretty typical in this kind of plan, a floor offset plan, was that if you're going to get this minimum benefit that's promised to you, that's all you're going to get. You transfer the profit-sharing money into the pension plan. We're going to use that to help fund the minimum benefit. But not on an individual basis, on a gross basis. On a gross basis, right. It's not kept as a separate account in the defined benefit plan. But how do you end up with less when you've been promised a defined benefit just subject to an offset of money coming from the contribution plan? If the contribution plan is still there and you're still getting that money, why do you end up with less? It's because of assumptions they made as to earnings. They take that balance in the defined contribution plan, project it to normal retirement, and they assume it's going to produce an annuity that's more than what it actually produces. In the defined contribution? In the defined contribution. So, in other words, there's an option in the defined contribution plan alone to get an annuity, but the actual annuity that it produces is less than DHL's assumptions that they use in offsetting the minimum benefit. So they've got these false assumptions. And did that change when they eliminated the transfer option? No, those assumptions were in place. But they were always able to be overridden, essentially, by the transfer. Right. But when they took away the transfer option, they didn't preserve the minimum benefit. They simply left in place the fact that you could get the balance in your account in a defined contribution plan as an annuity, okay, or as a lump sum, and you could get a benefit. So what they were offsetting wasn't real money? What they were offsetting was not real money. It was fake money. It was twice, roughly twice, or even in some cases more, than what you could actually get as an annuity under the defined contribution plan. All right. Well, that's clarifying. Go ahead with your argument. Okay. While this is a violation of the congressionally mandated risk-anti-cutback rule, it would have been okay for DHL to eliminate the employee's option to transfer the profit-sharing account balances into the pension plan if they had preserved the minimum pension accrued benefit. But they should have made some adjustments to their actuarial presumptions. Is that what you're saying? Or they could have done anything. They could have just said, we're going to pay you the minimum benefit, and you'll get your account balance. Or they could have said you're getting the account balance. Or what they could have said is you're going to get your annuity under the pension plan, and you're going to get an annuity under the defined contribution plan. And whatever that annuity under the defined contribution plan is, actually. They're going to offset the actual money. Yeah, the actual money instead of making these actuarial projections, which are very complex. They were getting $4,000 a month, and now they're getting $2,000 a month. Exactly. That's what happened in Mr. Tasker's case. He should have gotten $4,200 in the minimum benefit that was promised just under the pension plan, and he ended up getting $2,200 a month. Most of that was under the defined contribution plan. Only about $100 or $200 was under the defined benefit plan. So that's why they violated the empty cutback rule. They didn't preserve that minimum benefit. Any Treasury Department regulation that permits the substantial reduction in pension accrued benefits thwarts congressional intent and is illegal. Pelley's could not. Did the Department of Labor Benefits Section ever file an amicus brief? It doesn't here. And Tasker, I mean, have they ever said anything about what they think about all this? They did. It's in the record. Right after the Tasker case, I think it was the chief actuary, but it's in the record here, spoke at a conference, and it was reported in the B&A Pension Journal. And he said he was concerned about a recent case. The only recent case was Tasker about how the courts were construing the empty cutback rule in relation to this kind of case floor offset, and that this was something that they were very concerned about. And he's thinking, you know, Ask the Department of Labor for an amicus brief in this case to tell us. Because you're arguing about what their regulations mean, and maybe we should ask them. I spoke to this individual, and he said, We've commenced a study, and we're going to study the matter, and it's going to take us some time, and we're not going to do anything until we complete our study. So as far as I know that study is going on, I did ask him about it, but he said they weren't ready to do anything until they complete their study. But they are very concerned about it, and they're looking into it. What do we do with the First Circuit's case in Tasker? Well, the First Circuit case is wrong, and I spelled that out in my briefs. And they made two fundamental errors. So it's fundamentally flawed. What they did is first defy regulations, making the transfer option a protected benefit itself, okay? The First Circuit held that the transfer option was not a protected benefit under the empty cutback rule. And then they wrongly held that the transfer option was merely an ancillary benefit that could be eliminated without a regulatory exception. This is right in the regulations I've cited in two or three different places. Second, the First Circuit refused to consider the portion of the empty cutback statute and regulations that only permit such exceptions to ease administrative burdens and not to reduce vested accrued benefits. They wouldn't consider that. And that's clear not only in the statute, in the regulations. Right before they list the exceptions, they say, we can do this to, yes, Your Honor? No, go ahead, finish your question. Yeah, we can do this to ease administrative burdens, but we can't do it if it takes away a value, right? You know, okay? I thought that provision doesn't apply to this. That provision seemed to me to deal with a different exception for regulations that deal with administrative burdens, but it doesn't deal with the permission to pass regulations having to do with optional benefits. Oh, it does. It's right before those exceptions that list this transfer option exception. Right before that, the Treasury Department says, yeah, these are the exceptions we can make, and we can make them to ease administrative burdens, but we can't take away valuable rights. And the First Circuit said, oh, it's okay to take away a valuable right. And they did that. Yes, Your Honor? No, go ahead, finish. Okay, because you were ready to talk and I didn't. Okay, they did that. We're listening to your argument. They did that. Tasker's a problem. Oh, yeah, it is a problem. It is a problem, but it's wrong. It's clearly wrong. Let me ask you this. Tasker's the same thing, isn't it? It is the same. It's the same thing. Well, how many other people out there are going to challenge this in different circuits? I'm trying to get some idea of what the scope of the problem here is. Well, Mr. Tasker was an isolated case. He was in Massachusetts. I think he probably is the only person in Massachusetts. He came to me in my Boston office, and we did it. And then, you know. And this is a class action for everybody else dealing with DHL, but it's the same problem running around with regard to other plans elsewhere? I don't know that it's the same problem with other plans. I do know that. Is it all an artifact of this peculiar? I mean, apparently it's not unusual to have these offset plans, but is this one creating a particular problem because of this actual ‑‑ because of the funny money problem, it's not real money? I think so. These plans are really designed to give you this minimum benefit that was cut back. And it's typical to have the participants have to put their profit sharing money into the defined benefit plan to get that minimum benefit. But they can leave it in the profit sharing plan, but the only reason they would do that is if the profit sharing money has grown to such an extent that it's actually worth more than the minimum benefit. And that didn't happen to any of these folks. It rarely happens in this kind of plan. I'm still trying to understand. You represented Tasker? I did. I did. And now you're representing everybody else? A class of ‑‑ it's available to everybody else. Whoever signed up on this case, we made it available to everybody. Not everybody signed up. There's some people who, for example, are still working at DHL and are concerned about suing them. So not everybody else signed up. But it's open to everybody else. So there are other potential suits out there? I don't ‑‑ I think that, you know, that other people can join. We would probably leave it open for other people to join us so that maybe if you allow this to go down, maybe we'll encompass everybody else. Are there cases pending in any other circuit? Not to my knowledge. I don't believe there are. So I think this will be the case that will decide. And I'm hoping that the Ninth Circuit will get it right. I think the First Circuit got it wrong. You could save some time for rebuttals. Yes, I did. Let's hear from Brian. May it please the Court, my name is Brian Audelier, and I represent the DHL at Belize. I think there's really basically two questions before the Court. I don't think they're that difficult. And once decided, I submit, compel the affirmation of the judgment of dismissal. The first question is, is the relevant Treasury regulation consistent with the grants of authority to the Treasury Secretary as set forth in Revenue Code section 411B6? Haskell was wrong about this not being an optional benefit, right? I'm sorry? Haskell was wrong about the transfer itself not being an optional benefit. I think there's two ways to look at this, Your Honor. There's the explicit language in 411B6 that allows Treasury to look at an optional form of benefit. It allows it to. And reduce. Right, but it is an optional form of benefit. So Haskell was wrong about that. I'm not sure it's wrong. You can look at it either way. It's not wrong. It said it wasn't an optional form of benefit. It said it was an ancillary benefit. I think it said it was an ancillary benefit. But you get to the same place. In other words, in one instance what Treasury might be doing, but it has the grant of statutory authority in that optional provision the court is speaking to. But Tasker also looked at it from a slightly different way. It's not as an enumerated, as an ancillary benefit. It's not in the enumerated list of protected benefits under 411B6. It's just a fancy way of saying either way, if what you're dealing with is an accrued benefit, Treasury has the discretionary authority to craft a regulation. And it was done with precision. And it's important to talk about, and I think the panel raised this point. What are we looking at? How long is this ragged in on the books? And what has Congress done? But you've got that grant of authority. And, indeed, by the way, Your Honor, I think you were quick to note that the de minimis provision is a different section of the particular statute. Kagan. A different section. But it's a prior section. It's a prior section. It's a few different grants of authority. I understand that. But what I don't understand is, well, A, Tasker's basic analytic premise is wrong, because it is an optional benefit. So then the question becomes what difference does that make? Exactly, Your Honor. We win either way. But now I think it's important to drill down on the regulation itself and sort of its origins and where we are today. Now, by the way, this particular, ERISA was passed in 74. I'm sorry, Your Honor, I thought you were to speak. I was clapping. And then after that, in 88, along comes this amendment to the section granting Treasury the right to adopt the regulation. Now, what you have, and by the way, I mean, isn't ordinarily what this is about is if you have a pension plan and a 401K, you can move the money from one to another, and there are various reasons you want to do that. But there's no – but in this instance, there's the transfer, but then there is a consequent loss of benefits, you know, which is undeniable and which seems to flatly on its face violate the anti-cutback rule. So you can do what you want with the transfer, but can you then end up with them making less benefits than they would have made before? Where's the authority to do that? Well, again, Your Honor, as I think you pointed out – In other words, how does the right to eliminate that option supersede the basic anti-cutback rule? Okay. If you look at the statute – A, not B. Your Honor, I'm sorry my pen is in a hard paper format, but I put it onto my iPad. If you look at the statute itself, 411D6 at the top level protects accrued benefits. So as you read down, you've got to hop over the de minimis provision, where there's the grant of regulatory authority, to a sentence that says the following. The secretary made by regulations provide that this subparagraph shall not apply to a plan amendment described in Clause 2. It's an optional form of benefit unless it involves something going on in Clause 1, which are early retirement benefits or retirement-type subsidies. Not at issue here. So back focusing on this, you have this carve-out in the statute referring back to an optional form of benefit. And what we have here is a transfer option. So along comes Tasker. And now bearing in mind, Tasker was reported in F3rd. I think it's plaintiff's argument that the Treasury Department is on notice of the Tasker ruling. One would expect in a circumstance like that – Why don't we ask them? I'm sorry? Why don't we ask them? Ask who? The Department of Labor. I thought he said he did. I'm sorry. Why don't we ask them? The court. But I certainly, Your Honor, that's within your discretion, I believe. But this much is true. What we have is a regulation on the books for many, many years. And what happens is we've got the statute amended again and again. Let me see from my notes here. Three or four times since – When you're eliminating the transfer option, you're not only eliminating the transfer option, but you are changing the take-home benefit by a lot. I'm sorry. The question I missed. I'm asking whether you're saying, well, this was on the books. And I understand it was on the books. I would have understood it if I didn't know about this case to mean, yeah, there are reasons why somebody would have a distributional interest in transferring it, but you can eliminate that distributional interest and make them lose the money in the same place, but not that you can cut their take-home benefits by $2,000 a month. Okay. Two points, Your Honor. First, given the fact that this reg has been on the books for many, many years, and the particular provision has been the statutory provision revised three or four times since the promulgation of the regulation, this under Supreme Court and this Court's authority becomes the rule of law. And that's the Supreme Court. But that's what I'm trying to say. But it has a whole function that doesn't assume this kind of secondary result that doesn't come from the transfer itself, but comes from the way in which the benefits here are being calculated, i.e., I mean, one would have thought that the offset was to real money, but it's not to real money. Your Honor, there's a couple of strands I think I need to tease out here. First up, and again, the regulation now enjoys the force of law under Supreme Court in 1974. Now, you're speaking to the hardship, I think, that they claim is visited upon them. In other words, this is somehow manifestly unfair to them. Well, first of all, and I think as the First Circuit recognized, ERISA is an enormously complicated statute, and as the Supreme Court said in Mertens, it represents all of these innumerable complicated sort of compromises. But importantly, Your Honor, Congress, with the adoption of defined contribution benefit plans, recognized, and the trend is, and it's expressly endorsed by Congress, to allow people control over their own pensions and their own pension futures. And the reason I believe that Treasury treats this differently, why you have this carve out, is because at the end of the day, they keep that money. These are not insignificant amounts of money. So they still get to collect their contribution benefit? They can roll it over into an IRA. Now, it's not in the record, but the stock market is enjoying a remarkable run-up today. And again, Congress is saying, and by the way, it is the trend in the industry and business that we live in a defined contribution world. I think the Court's well familiar with their own thrift savings plan. But when you talk about so-called hardship visited upon the plaintiffs, everyone is forgetting, or they're conveniently forgetting, there are these huge sums of money that are still in their control. And that's why the regulations in place, that's why Treasury treated it differently, and that's why they didn't intervene in this case. They never filed an amicus brief. His point is that somehow Treasury, and by the way, this so-called BNA article says nothing of Tasker. It says something about odd results involving these floor offset plans, but you'll find nothing in there in this two-page BNA article that speaks anything of this. But his point is that the Treasury Department is well aware of Tasker, upset with the outcome. Well, again, one would think if that were the case, they'd be here today. And again, we're three years now since Tasker. And make no mistake, what we have is a second action brought by the same lawyer on behalf of another group of participants, obviously dissatisfied with Tasker. He admits it's precisely the same case, but let's take it to a new circuit. But I'm starting, first of all, he doesn't have to do that. Second of all, Tasker's premise was wrong. Its premise was wrong. Where you go from there is something else, but its premise was wrong, that is that this is not an optional benefit. It is an optional benefit. Again, Your Honor, if it's an optional benefit, if it's precisely within the carve-out in 411B6. But the question is what can be carved out? Well, again, an optional form of benefit, if it's a protected benefit, the Treasury Secretary is empowered to promulgate regulations. And by the way, it's the broadest grant of authority possible. There are no limitations unless it involves early retirement benefits or retirement-type subsidies. Regulations say that you can eliminate the transfer benefit option, even if the result is to cut the defined benefit plan. It basically -- No, it doesn't say that. Well, Your Honor, what it says, you can, it's talking about where, what are the limits of 411B6. Otherwise, the regulation is surplusage. It doesn't mean anything. What's the point of the regulation? In other words, it's explaining what circumstances where you can reduce the benefit. An option with regard to the location of the money. And, for example, there are all kinds of permutations in which you could have the transfer and you wouldn't have any change in the defined contribution, defined benefit, I'm sorry. I think the answer, Your Honor, is then why the fuss? In other words, why pass a regulation if the regulation is- They care about that. I'm sorry. I mean, people care whether they can take money out of their 401K and put it into an IRA. They care about that. But I think if you look at the particular language of the regulation, the question presented is to what extent may Section 411D6 protected benefits under a plan be reduced or eliminated? Now, it's plaintiff's position that they are entitled to the protections of 411D6. That's why we're here. And now Treasury comes along and says what you can do is you can amend the plan to eliminate provisions permitting the transfer of benefits between a DC and a DV plan. And the question presented is even if it impairs 411D6 protected benefits. I don't, again, the Treasury's language is quite clear and dovetails precisely the statute. And again, with the statutory carve-out, what Congress is saying in these circumstances, and again, it's a recognition that you've got two bags of money taken together that may form the benefit or may not. And what happened here is these people were given one bag of the money, so it doesn't sort of offset the defined benefit plan. And again, those assets, and I think the Court could take judicial notice of what the S&P 500 has done over the last 16 months, those assets are shooting through the roof. And I take issue with counsel's characterization that sort of these DC plans always lose money. Is it your understanding that the plaintiff's position requires us to hold that the regulation is invalid? Well, Your Honor, this much I will say. I'll try. The regulation is dead on point. So I find it hard to concede or to say that the regulation doesn't apply, but then I guess you get to the question whether or not Treasury has somehow exceeded authority in promulgating the regulation, which takes us again to the fact that the regulation was adopted in 1988. 411D6 has been amended three or four times since then, and under the Supreme Court, and this Court's opinion in a case called Ward v. IRS, it's not in my brief, 784F2nd 1424, the reg enjoys the force of law. And it's probably worth pointing out the companion Supreme Court opinion, Cottage Savings v. IRS, 499 U.S. 554. And it's probably worth repeating what the Supreme Court had to say, and this is important. And I think, by the way, there's some recognition that this is an enormously complicated area, the Revenue Code and ERISA. Well, we'll give you that. But what I'm saying is what the Supreme Court recognized is when Treasury comes in and wades into this enormously complicated area, and then Congress amends the statute, and Congress does nothing to upset a regulation, it becomes law. But I understood Judge Berzon to be asking you on what I guess is troubling me, is why can't this regulation be interpreted to mean that you can't, that it's okay to do this unless it results in the material reduction of benefits? I guess I believe that the answer is the express language of the regulation speaks to when may 411D6 protected benefits, that includes accrual. I think what's at issue here is plaintiffs claim that they've suffered a reduction in accrued benefits. It's how the subsection is delineated in the Revenue Code. And there's no opt-out from A, from the accrued benefits. They flat rule that you cannot reduce accrued benefits, right? The statute says you cannot reduce accrued benefits, which begs the question of what's an accrued benefit. This regulation fits in into the optional form of benefit language right there in the statute, or is the first circuit? You can change an optional form of benefit, but you can't change an accrued benefit, whatever an accrued benefit is. But an optional form of benefit can reduce, if it reduces an accrued benefit, it's perfectly legal. That's the question, not the answer, right? I'm sorry. You're assuming that when they say you can eliminate an optional form of benefit, i.e., the transfer, it's okay to reduce an accrued benefit in the course of doing that. And that's really the question. Okay. And I'm going to say it's right there in the statute. The Reg dovetails the statute. It doesn't say anything. The Reg doesn't say anything about whether you can eliminate an optional, the transfer right, and with the result of violating A, i.e., reducing an accrued benefit. Well, again, I simply read the first sentence the way the question is posed in the Reg differently. To what extent may Section 411D6, protected benefits, that includes, that's a rather broad language, that necessarily includes accrued benefits under a plan be reduced or eliminated? Then the question is, a plan may be, excuse me, the answer, a plan may be amended to eliminate provisions permitting the transfer of benefits between and among defined contribution plans and defined benefit plans where that reduces or eliminates protected benefits. I should make the raise on point. The right of transfer. Well, again, but the right of transfer, again, is not listed in the 411D6. It protects accrued benefits. That's the overarching theme of the statute. So when the question is posed, when can we reduce 411D6 protected benefits, he claims a diminution in accruals. It doesn't say transfer rights. But if, in fact, the transfer right described in the answer undermines, reduces, or eliminates the accrued benefit, Treasury is saying that's okay. And, again, they've known about Tasker for three years now. He says they're upset with it. You would have thought they would have intervened or filed a notice brief. We got that point. All right. Unless there are any questions, I'll happily go back to my seat. All right. Thank you. Exactly, Your Honors. 411D6 has subsection A, capital A, and subsection capital B. Subsection capital A is you cannot reduce accrued benefits. There's no exception to that. And that's what DHL did. Subsection B says for purposes of this anti-cutback rule, we're going to treat optional forms of benefit as an accrued benefit. 411A7, capital AI, defines accrued benefit in a pension plan, defined benefit pension plan, to be the benefit, the accrued benefit, at your normal retirement age, age 65, which was what is expressed as an annuity, which is what the minimum benefit is. So what DHL did was they reduced the accrued benefit under subsection A, which they cannot do. The exceptions that are enumerated in B only apply to B, and they allow the cutback of optional forms of benefit, like the transfer option itself, an optional form of benefit, where that's an administrative burden to the plan, but will not have more than a de minimis effect on individuals. It cannot, there's another sentence that says B, in the discretion of the Treasury, will not apply to certain optional forms of benefit as determined by the Secretary of Treasury, unless it's an early retirement benefit, but that has nothing to do with something that's an accrued benefit on its own under A. So that cannot apply here. The Treasury regulation in itself, in expressing what exceptions it's making, says we can make these exceptions to ease administrative burdens, but not to take away valuable rights. And if you're writing our opinion, you say the First Circuit went wrong in what? First Circuit went wrong in saying the transfer option itself is not a protected optional form of benefit, because it clearly is under the regulations we've made to cite. Therefore, if you wanted to allow employers to take that away for administrative ease, you have to have an exception. But that isn't why they're doing it. That's the one place you're flat wrong, because there are two different provisions, one about administrative ease and one about optional benefits, and they're separate. So that's not helpful, but there still is a problem with the First Circuit opinion. Okay, I don't have time to get into it, but I think I'm right on that, Your Honor, but I'll reread it and you can reread it. But the point is the ability to take away the accrued benefit is not there. It's not what Congress intended. It's not what the Treasury Department intended, but it's what happened here. The kind of what the Treasury, I'll tell you what it had in mind, because I was in practice then in the benefits area. I'm old enough to know. There were defined benefit plans that allowed defined contribution plans in big companies to let the participants move the money over from the defined contribution plan to the defined benefit plan and preserve it as an account balance. Or a balance for years or something like that. Keep it as an account balance so that the distribution had nothing to do with the normal benefit under the defined pension plan. It was a separate account balance, which those plans didn't ordinarily have to do. They didn't have to maintain separate account balances, and the participant wasn't really getting any benefit that he wouldn't have gotten under the defined contribution plan. Still had an account balance. If he had $500,000, didn't matter whether he had $500,000 under the defined contribution plan in an account or $500,000 in the defined benefit plan in an account that he could get separately. Didn't affect, that kind of transfer didn't affect your pension. Okay. That's what existed back then. That's what the Treasury Department had in mind when it put in this regulation. Okay. Thank you. Thank you, counsel. We appreciate your arguments on this interesting case. And have safe travels. Back east. Thank you.
judges: Schroeder, Paez, Berzon